## Stephen Girard Estate Trustees, Appellants, v. Bankers Securities Corporation.

496 

Argued November 22, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

 reargument refused June 21, 1967.

*Ernest R. von Starck,* with him *Donald A. Scott, Arthur Littleton, Thomas J. Gaffney,* and *Gaffney and Gaffney,* and *Morgan, Lewis & Bockius,* for appellants.

*Bernard M. Borish,* with him *Alan J. Davis,* and *Wolf, Block, Schorr and Solis-Cohen,* for appellee.

OPINION BY MR. JUSTICE COHEN, May 2, 1967:

For many years prior to 1951 the principal income-producing asset of the Stephen Girard Trust Estate had been Snellenburgs Department Store. By that year, however, the sales volume had declined substantially from its wartime peak, and the owners of the business were anxious to cease operations. Although

the Estate's lease with N. Snellenburg & Co. was not due to expire until 1958, the Estate entered into discussion with Bankers Securities Corporation (Bankers) regarding a possible takeover of Snellenburgs by Bankers. These discussions culminated in a purchase of all of the stock of N. Snellenburg & Co. by Bankers, the purchase of the Snellenburg-operating assets by Bankers and the taking of a sublease by Bankers until January 31, 1958.

Bankers then established a Snellenburgs-Division to operate the business. About a year later (May, 1952), Bankers and the Estate opened negotiations for a new long-term lease. After more than a year of negotiations the parties executed a new lease on November 6, 1953. The lease was for a period of 25 years and contained extensive provisions regarding the rights and obligations of the parties. Among these provisions is the one primarily at issue here:

"20 A. The liability of the Lessee (and of any assignee of Lessee to whom Lessee may assign this lease under Paragraph 20 B hereof without the Lessor's consent upon such assignee's assuming in writing all of the Lessee's obligations hereunder), for the performance of the covenants and agreements herein contained and the liability for breach of any of the said covenants or agreements howsoever arising, and the exercise or enforcement of any remedies afforded under the terms hereof or under the laws of the Commonwealth of Pennsylvania shall be and is hereby limited to the assets which would be available to meet such liability if (I) a separate corporation had executed this lease as Lessee, and (II) on the date on which this lease commenced such corporation had a net worth of \$10,-000,000, and (III) such net worth were thereafter charged with any losses not restored by subsequent profits sustained in the operation of the department store business conducted under the name 'Snellenburgs'

or under such name as may be used at any time in the future to identify that business, and (IV) there were treated as withdrawn by such corporation's shareholders from such net worth all sums in excess of $10,000,-000 whether or not actually withdrawn, provided that no withdrawal shall be treated as having been made which would reduce the said net worth below $10,000,-000 at the time of such withdrawal.

"B. The Lessee may at any time (I) sublet or license portions of the demised premises for the operation of leased departments under the name 'Snellenburgs' or such name as may be used at any time in the future to identify the department store business on the demised premises, and with the written consent of Lessor, sublet any part or all of the demised premises for any of the purposes permitted hereunder, but in either of such events Lessee shall not be relieved of its obligations hereunder; or (II) assign this lease to a corporation engaged in the type of business permitted to be conducted on the demised premises under the terms of this lease and whose net worth is not less than the liability of the assignor determined in accordance with Paragraph 20A at the time of such assignment, whether such corporation be affiliated directly or indirectly with the Lessee, and in the event of such assignment Lessee shall be relieved of all obligations hereunder upon the assignee's assuming such obligations in writing. This right of assignment shall not be exhausted by one exercise thereof and this lease may be assigned and re-assigned from, by or to the Lessee without increasing or extending Lessee's or the assignee's liability hereunder, provided that in such case the net worth of the assignee is at least equal to the liability of the assignor determined in accordance with Paragraph 20A above at the time of such assignment, and that in each case the assignee assumes in writing the obligations imposed upon the Lessee hereunder."

Pursuant to the arrangements made by the parties, the new lease took effect on May 1, 1957. The Snellenburg operation continued to lose money, however, and despite two rent reductions by the Estate at Bankers' request, losses continued to mount until Bankers closed the store on February 15, 1963. It then sold off its remaining inventory in a bulk sale, and, later it similarly sold its remaining assets (fixtures, accounts receivable, miscellany). These post-closing dispositions resulted in further losses to Bankers.

The Estate then brought the present suit in equity for an accounting to determine the amount of Bankers' liability, if any, under the lease. The Estate claims (1) that the losses which resulted from the actual closing of Snellenburgs, as distinguished from those incurred while business was actually being conducted, are not losses sustained in the "operation of the department store business" and cannot be considered in computing Bankers' liability; and (2) income tax benefits accruing to Bankers by using the Snellenburgs' losses to offset profits realized in other divisions of Bankers' business should be allocated, at least in part, to the Estate.[1]

The court below decided both issues in Bankers' favor, and the Estate has appealed.

The record is voluminous and the arguments are extensive, but we find no merit in the Estate's contentions. The plain meaning of Clauses 20A and 20B quoted above limits Bankers' liability to $10,000,000 in a way that permits no serious consideration of the Estate's position. The "separate corporation" concept embodied in those clauses indicates that the parties intended that no further liability would exist if the stat-

---

[1] It is undisputed that Bankers obtained tax savings by operating Snellenburgs as a division and by including the results of its annual operations as part of a consolidated federal tax return together with its other, more profitable, divisions.

ed sum were lost and that the computation would be made as if the lessee were a separate corporation. In this light the losses incurred by the Snellenburgs Department Store after February 15, 1963, are deductible from the $10,000,000 figure, and the overall tax benefits realized by Bankers through consolidation are irrelevant.

Moreover, the testimony produced in the case supports our view of the parties' intention regarding the meaning of losses sustained in the "operation of the business." This testimony was to the effect that liquidation losses such as those involved here are, in fact, losses sustained in the operation of the business, and while we do not hold that parties cannot provide otherwise by specific language, we hold that both the language used here and the accepted theory require recognition of Bankers' "liquidation" losses in computing its liability under the lease.

With regard to the tax savings argument, apart from the language of the lease we find no basis to sustain the Estate's position. Without specific language to such effect,[2] the fact that one party to a transaction subsequently realizes tax benefits cannot affect the relationship between the parties. If two partners agree to share profits equally but one is in a 50% tax bracket and the other in a 38% bracket, the former surely could not demand more than half of the partnership's profits on the ground that the after-tax effect of the arrange-

---

[2] In *Case v. New York Central Railroad Company*, 15 N.Y. 2d 150, 204 N.E. 2d 643 (1965), improperly relied upon by the Estate, the agreement specifically provided that corporations showing losses were to be reimbursed for a portion of their losses measured by a substantial part of tax reduction obtained by profit companies; and the profit companies would gain the benefit of a portion of the tax saving resulting from this utilization of the losses of the others. There is not even a hint or a whisper of such an understanding in the instant case.

ment otherwise would leave him with less than half the profits. Yet, this is the type of argument made by the Estate. We reject it.

The decree of the court below is affirmed at appellants' costs.

Mr. Justice ROBERTS concurs in the result.

CONCURRING AND DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Under the terms of this lease agreement, the losses which resulted from the actual closing of Snellenburgs as distinguished from those incurred while business was actually being conducted, are not losses sustained in the "operation of the department store business" and cannot be considered in computing Bankers' liability. To this extent, I would modify the Decree. I would also provide that each party should pay its own costs.

Mr. Justice MUSMANNO joins in this Concurring and Dissenting Opinion.